IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| ROSEMARIE A. WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 13-0831-CV-W-REL-SSA |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Rosemarie Williams seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) finding that plaintiff's depression and anxiety are not severe impairments, (2) failing to provide a narrative bridge linking the medical evidence with the limitations found in the residual functional capacity, and (3) failing to properly analyze plaintiff's credibility. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I. BACKGROUND

On September 23, 2011, plaintiff applied for disability benefits alleging that she had been disabled since September 10, 2011. Plaintiff's application was denied initially. On April 2, 2013, a hearing was held before Administrative Law Judge Raul Pardo. On April 25, 2013, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On July 17, 2013, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.     STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.     BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental

impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.     Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.     Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.     Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.     Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.     Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of plaintiff and vocational expert Jennifer Teixeira, in addition to documentary evidence admitted at the hearing.

## A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Earnings Record

The record shows that plaintiff earned the following income from 1974 through 2010:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1982 | $ 2,843.17 | 1998 | $ 0.00 |
| 1983 | 4,862.61 | 1999 | 4,419.82 |
| 1984 | 2,672.46 | 2000 | 5,843.95 |
| 1985 | 6,105.30 | 2001 | 10,909.28 |
| 1986 | 4,724.08 | 2002 | 7,950.57 |
| 1987 | 4,457.36 | 2003 | 438.55 |
| 1988 | 5,813.78 | 2004 | 5,458.12 |
| 1989 | 1,520.77 | 2005 | 0.00 |
| 1990 | 0.00 | 2006 | 4,037.35 |
| 1991 | 5,954.46 | 2007 | 4,625.06 |
| 1992 | 1,842.20 | 2008 | 6,612.00 |
| 1993 | 0.00 | 2009 | 0.00 |
| 1994 | 5,335.74 | 2010 | 1,478.88 |
| 1995 | 1,265.25 | 2011 | 12,359.44 |
| 1996 | 1,120.95 | 2012 | 0.00 |
| 1997 | 76.32 | | |

(Tr. at 177-178, 180).

**Function Report**

In a Function Report dated November 20, 2011, plaintiff reported that she tries to take care of her daughter, she takes care of a pet, she needs help getting dressed because she cannot fasten buttons or clips, she needs someone to help her cut up her food, she needs help washing herself. It takes plaintiff 45 minutes to an hour to prepare a microwaveable meal. She folds laundry for an hour at a time. Plaintiff goes out of her home once a week on average; and she can walk, drive a car or ride in a car for about 30 minutes each. She can shop in stores for groceries for 45 minutes to an hour. Her hobbies include reading and watching television. Plaintiff's condition does not affect her ability to concentrate, understand, follow instructions or get along with others. She is able to handle stress, but sometimes it is difficult for her to handle changes in routine (Tr. at 196-203).

**B.     *SUMMARY OF MEDICAL RECORDS***

Plaintiff submitted medical records beginning about two years before her alleged onset date.

On November 16, 2009, plaintiff was seen by Teresa Walker, M.D., at ReDiscover Mental Health (Tr. at 799). Plaintiff's hygiene and grooming were normal. Her mental status exam was normal except that she was irritable and angry. Insight and judgment were normal, memory was normal, concentration was intact. Plaintiff was diagnosed with generalized anxiety disorder ("GAD"), mood disorder, severe occupational and medical problems and was assessed with a Global Assessment of Function ("GAF") Score of 45.

On December 4, 2009, plaintiff was seen by Dr. Walker at ReDiscover Mental Health (Tr. at 796). Plaintiff reported that she may need another surgery or chemotherapy. Her mental status exam was normal -- good grooming, good hygiene, good eye contact, regular

speech normal psychomotor activity, no suicidal or homicidal ideation, normal thought process, full affect, congruent mood, normal insight and normal judgment. She was assessed with generalized anxiety disorder with a GAF of 45. She was continued on Ativan (for anxiety) and Nortriptyline (antidepressant).

On January 8, 2010, plaintiff saw Dr. Walker at ReDiscover Mental Health (Tr. at 795). Plaintiff indicated that she had been seeing her primary care physician for recurrent colds. Plaintiff said she was not sure about kidney cancer issues. "Now worried about youngest daughter -- charged with theft of cell phone case." Plaintiff was not sleeping well due to kidney surgery. On exam, Dr. Walker noted that plaintiff's grooming was good, hygiene was good, eye contact was good, psychomotor activity was normal, speech was normal, no suicidal or homicidal ideation reported, thought process was normal, affect was full, mood was normal, insight was normal, judgment was normal. No abnormal findings were noted. Plaintiff was assessed with generalized anxiety disorder with a GAF of 45. Her Ativan was refilled and she was told to try Melatonin.[1]

On February 4, 2010, plaintiff saw Dr. Walker at ReDiscover Mental Health (Tr. at 791-794). Plaintiff reported a lot of stressors with three daughters, ages 20, 17 and 16. "Cars were totaled, kids ok." Plaintiff had undergone surgery due to renal cancer and was not sure if she was going back to work or not. Plaintiff reported worrying all the time about the recurrence of cancer. "Her mood is generally OK. Has a lot of health issues." Plaintiff reported eating well but she was unable to gain weight. Her motivation was OK. She was irritable but less depressed, less tearful than she was. "A lot of anxiety/worry - panic feelings. Tormented that maybe 1 cell in kidney will start cancer." No mood disturbance was noted. No

---

[1]Melatonin is a hormone found naturally in the body. It is an over-the-counter supplement used to assist in falling asleep.

thought disturbance was noted. Plaintiff continued to smoke. "Enrolled in Longview in some program with daughter. Excited to get her CNA. Works for family to care for elderly parents. Very tired with school." Plaintiff's mental status exam was entirely normal: grooming and hygiene were good, eye contact was good, psychomotor activity was normal, speech was normal, no suicidal or homicidal ideation, thought process was normal, affect was full, mood was normal, insight was normal, judgment was normal. Dr. Williams assessed generalized anxiety disorder. "Very happy with job/school." She assessed a GAF of 55 and refilled plaintiff's medications.

Almost a year later, on January 19, 2011, plaintiff was seen by attending physician Douglas Tietjen, M.D., at St. Luke's Hospital East where she underwent a CT scan of her pelvis (Tr. at 305-309). The scan was normal except multiple nonobstructing kidney stones were observed, with the largest measuring 3 mm. Plaintiff's bowel was unremarkable without evidence of obstruction or acute inflammatory changes. Plaintiff had chest x-rays which were normal as to heart and lungs.

Seven months later, on August 14, 2011, plaintiff was seen in the emergency department at St. Luke's Hospital East for vomiting, gradual and worsening headaches and high stress (Tr. at 303). She had run out of her Fioricet (a schedule III controlled substance, treats tension headaches) two days earlier, and her headache had started the day before. Plaintiff continued to smoke. On physical examination, it was noted that plaintiff appeared anxious, had pharyngeal erythema (i.e., her throat was red), and tachycardia (a faster-than-normal heart rate at rest). The rest of her physical and psychological examination was normal. She was assessed with sinus infection and headache. She was prescribed an antibiotic.

Two days later, on August 16, 2011, plaintiff was seen in the emergency department and was then admitted under the attending physician, Heather Kort, D.O., to St. Luke's Hospital

East, for chest pain and headache (Tr. at 276-301). Plaintiff indicated her symptoms were mainly related to her headache. She developed chest pain as well as nausea and vomiting associated with her headache. She then began having "new neck and back stiffness." A further review of systems was done and plaintiff denied any other symptoms. She did report previous diagnosis of fibromyalgia, Meniere's disease,[2] high blood pressure, high cholesterol/triglycerides, and prior surgery for renal cell carcinoma. She specifically denied fatigue (Tr. at 290).

Plaintiff was still smoking and had indicated that she had tried to quit. She reported having suffered with migraines during her entire life. She said she was using Fentanyl patches[3] and Oxycodone[4] four time a day for fibromyalgia pain and that her fibromyalgia pain was "well controlled" on this medication. Plaintiff reported that she was married with two teenaged daughters at home, and she was disabled. CT scan of her head was entirely normal.

---

[2]Meniere's disease is a disorder of the inner ear that causes spontaneous episodes of vertigo -- a sensation of a spinning motion -- along with fluctuating hearing loss, ringing in the ear (tinnitus), and sometimes a feeling of fullness or pressure in the ear.

[3]Fentanyl is a schedule II controlled substance. It is an opioid pain reliever.

[4]Oxycodone is a schedule II controlled substance. It is an opioid pain reliever.

All of her tests were normal except it was noted that she had questionable mitral stenosis.[5]  She had normal left ventricular systolic function with an estimated ejection fraction of 60%.[6]  Because plaintiff had no history of rheumatic fever, it was decided that she would follow up with another echocardiogram as an outpatient.  Her chest pain was noted to be "likely noncardiac in nature."

Plaintiff was discharged on August 19, 2011, with prescriptions for Atenolol (treats high blood pressure and chest pain), Fioricet (a schedule III controlled substance, treats tension headaches), Fentanyl patch (schedule II controlled substance, treats pain), Nicoderm (over-the-

---

[5]Mitral stenosis -- also called mitral valve stenosis -- is a narrowing of the heart's mitral valve.  This abnormal valve does not open properly, blocking blood flow into the main pumping chamber of the heart (left ventricle).  The main cause of mitral valve stenosis is an infection called rheumatic fever, which is related to strep infections.  Rheumatic fever -- now rare in the United States, but still common in developing countries -- can scar the mitral valve.  Mitral valve stenosis can cause fatigue and shortness of breath, among other problems.



Normal mitral valve

Narrowing of mitral valve (mitral valve stenosis)

©ADAM.

[6]"During each heartbeat cycle, the heart contracts and relaxes. When your heart contracts, it ejects blood from the two pumping chambers (ventricles).  When your heart relaxes, the ventricles refill with blood.  No matter how forceful the contraction, it doesn't empty all of the blood out of a ventricle.  The term 'ejection fraction' refers to the percentage of blood that's pumped out of a filled ventricle with each heartbeat.  The left ventricle is the heart's main pumping chamber, so ejection fraction is usually measured only in the left ventricle (LV).  An LV ejection fraction of 55 percent or higher is considered normal."
http://www.mayoclinic.org/ejection-fraction/expert-answers/faq-20058286

counter nicotine, used to help stop smoking), Nortriptyline (antidepressant), Prenatal vitamins, Simvastatin (reduces cholesterol), "Soma[7] per home medications", Topamax (prevents migraine headaches), Roxicodone,[8] and Restoril.[9]  She was instructed to follow a low-fat diet.

September 10, 2011, is plaintiff's alleged onset date.

On September 13, 2011, plaintiff was seen by Sanjaya Gupta, M.D., at St. Luke's Hospital East for a follow up on suspected mitral valve stenosis (Tr. at 270-271).  She had another echocardiogram done which showed normal left ventricular systolic function with an estimated ejection fraction of 65% and severe rheumatic mitral stenosis which had worsened since her hospital stay the month before.

On September 23, 2011, plaintiff applied for disability benefits.

On September 27, 2011, plaintiff was admitted under the attending physician, Matthew Deedy, M.D., to St. Luke's Hospital East for rheumatic mitral stenosis (Tr. at 265-268).  A TEE[10] procedure was performed.  Carlos Rivas-Gotz, M.D., found that plaintiff had normal left ventricular systolic function with an estimated ejection fraction of 60%.  She had moderate rheumatic mitral stenosis at rest.

---

[7]Soma is a schedule IV controlled substance.  It is a muscle relaxer.

[8]Roxicodone is a schedule II controlled substance.  It is an opioid pain reliever.

[9]Restoril is a schedule IV controlled substance.  It is a benzodiazepine.

[10]"An echocardiogram (echo) uses high-frequency sound waves to produce a graphic outline of the heart's movement.  A transesophageal echo (TEE) test is a type of echo test in which the ultrasound transducer, positioned on an endoscope, is guided down the patient's throat into the esophagus (the 'food pipe' leading from the mouth into the stomach).  An endoscope is a long, thin, flexible instrument that is about ½ inch in diameter.  The TEE test provides a close look at the heart's valves and chambers, without interference from the ribs or lungs.  TEE is often used when the results from standard echo tests are not sufficient, or when your doctor wants a closer look at your heart."
http://my.clevelandclinic.org/heart/diagnostics-testing/ultrasound-tests/transesophageal-echocardiogram-tee.aspx

On September 29, 2011 -- six days after plaintiff filed her disability application -- she was seen by either Francisco Judilla, M.D., or Robert Williams, D.O., at Doctors Hospital for lower back pain and fibromyalgia (Tr. at 412-415). Dr. Williams's name appears at the beginning of the record, but it is electronically signed by Dr. Judilla. As to her lower back pain, the doctor wrote, "Underlying diagnosis or cause is unknown." Plaintiff described her pain as an 8 out of 10; "when present it interferes with most, but not all, daily activities. . . . Patient's statement regarding effect on life: problems at home -- inability to do housework; problems at work -- inability to work." Plaintiff also reported pain in her hips and knees. She rated this pain a 9 out of 10. She reported pain in her buttocks which she rated a 7 out of 10. She reported fatigue, generalized aching, restlessness, and sleeping problems. She reported chest pain at rest or with exercise, constant leg cramps and pain when walking a short distance, muscle tenderness, loss of muscle strength, back pain, constant joint pain, constant joint stiffness, constant joint swelling, constant weakness, headache, and easy bruising. Her past health history indicated a negative psychiatric history.

This record states that a "mirror fell and cut her R leg and had 18 staples Aug 2011." However, the emergency room records dated August 16, 2011, do not reflect any cut -- plaintiff went to the hospital on that day complaining of a severe headache. This record shows plaintiff's "current or most recent occupation" as "student/works part time for cardiologist." Plaintiff continued to smoke and said she was exposed to second-hand smoke. Her current exercise level was "exercise regularly, 20 minutes or more, once or twice weekly and exercise regularly, 20 minutes or more, 3 or more times per week."

On exam plaintiff had normal breath sounds. Her cervical spine was normal. Her thoracic spine was normal. She had tenderness and muscle spasm in her lumbar spine. Her judgment and insight were normal, mood and affect were normal and appropriate. Dr. Judilla

wrote, "PCP wants Pain doctor [to] take care of narcotic. Pt understand[s] that we do routine Drug test & only 1 doctor prescribe[s] narcotics. Pt will retain PCP." Dr. Judilla ordered an MRI of plaintiff's lumbar spine, left knee, and bilateral hips. He ordered an EMG.[11] He told her to follow up in one week.

The following day, on September 30, 2011, plaintiff saw James Stewart, M.D., at St. Luke's Hospital for mitral stenosis. (Tr. at 322-325, 350-353, 378-409). She complained of increased chest pain and shortness of breath -- she was unable to walk across a room without getting out of breath. "Mrs. Williams works with special needs children." Plaintiff continued to smoke a pack of cigarettes per day. Plaintiff voiced her desire to quit and said she would be willing to try a nicotine patch.

Plaintiff denied easy bruisability. "She does state that 2 weeks ago she did sustain an injury from a mirror on her right shin, where she did receive 18 staples. These staples have been removed. She does have a Tegaderm in place that is clean, dry, and intact." A Tegaderm is a waterproof dressing used to protect wounds. Plaintiff denied depression but reported anxiety. "She does have partial upper dentures. She is missing teeth. Her dentition is poor. She states this is secondary to chemotherapy that she [underwent] from her renal cell cancer."

Plaintiff had normal breath sounds in the bilateral upper lobes but diminished breath sounds in the bases. She had no edema in her extremities. Dr. Stewart discussed with plaintiff the likely need for a mitral valve replacement. "She expressed concern about postoperative pain management."

Plaintiff was admitted to the hospital. On October 3, 2011, she had a coronary angiography which showed no occlusive coronary disease. "She had not had dental care for

---

[11]Electromyography (EMG) is a diagnostic procedure to assess the health of muscles and the nerve cells that control them (motor neurons).

some time and was planning to have her upper teeth extracted.  Because this was a risk for potential infection, she was seen by the facial surgery team and underwent extraction of all of her upper teeth on 10/04.  We did keep her an extra day yesterday because of significant discomfort with this.  Today, she is feeling better, but has been using IV Dilaudid[12] every 2 hours."

Cardiac catheterization which showed no blockages in her coronary arteries and ruled out coronary artery disease.  "The patient has been having increased low back pain secondary to being bed bound and also only able to use IV medication for her chronic low back pain in preparation for surgery.  For this reason, the pain management team has been consulted.  At home, the patient is usually on fentanyl patch[13] 100 mcg an hour, oxycodone[14] 30 mg 4 times a day and Fioricet.[15]  At this time the patient is only able to take morphine[16] IV for her pain along with the fentanyl patch and this is not enough to alleviate her chronic back pain.  The patient states that the pain started about 10 years ago after a motor vehicle accident."  Plaintiff's pain medications in the hospital included Topamax (prevents migraine headaches) twice a day, Roxicodone[17] every 6 hours, Nortriptyline (antidepressant) once a day, Fioricet 4 times a day, Fentanyl patch, morphine every 2 hours, Percocet[18] every 6 hours, and Fentanyl IV every 3 hours.  On exam plaintiff had two positive trigger points.  Plaintiff's IV morphine,

---

[12]Dilaudid is a schedule II controlled substance.  It is an opioid pain reliever.

[13]Fentanyl is a schedule II controlled substance.  It is an opioid pain reliever.

[14]Oxycodone is a schedule II controlled substance.  It is an opioid pain reliever.

[15]Fioricet is a schedule III controlled substance.  It treats tension headaches.

[16]Morphine is a schedule II controlled substance.  It is an opioid pain reliever.

[17]Roxicodone is a schedule II controlled substance.  It is an opioid pain reliever.

[18]Percocet is a schedule II controlled substance.  It is an opioid pain reliever.

Percocet, Fentanyl, Roxicodone and Fioricet were all discontinued until after her mitral valve replacement. She was started on IV Dilaudid. "The patient has had an adverse reaction to epidural steroid injection in the past and has been advised not to get them again."

Plaintiff was discharged on October 6, 2011. Her Oxycodone and Fioricet were discontinued and she was given a prescription for Dilaudid along with a Fentanyl and Lidocaine (anesthetic) patch. "We spent 5 minutes talking about the hazards of smoking and the benefits of cessation."

From October 10, 2011, through October 30, 2011, plaintiff was admitted to St. Luke's Hospital to undergo a mitral valve replacement (Tr. at 314-321, 346-348, 354-376). Her surgery was postponed due to plaintiff's blood work showing an infection. She was seen by Steven Prstojevich, M.D., D.D.S, who evaluated her mouth and, despite plaintiff indicating she was in extreme pain where her teeth had been removed, found that her mouth was healing as expected and was not the cause of her infection. Plaintiff denied joint pains or muscle aches (Tr. at 359). Urinary tract infection was ruled out (Tr. at 358). Plaintiff subsequently underwent a mitral valve replacement on October 14, 2011. She was assessed by Sonali Agarwal, M.D., of the Pain Management Team on October 18, 2011 (Tr. at 360-361). Plaintiff reported that her pain was not being controlled; she was then on Fentanyl patch (a schedule II controlled substance, an opioid pain reliever), Lidocaine patch (anesthetic), Nortriptyline (antidepressant), Fioricet (a schedule III controlled substance which treats tension headaches), and Dilaudid (a schedule II controlled substance, an opioid pain reliever) (Tr. at 361). The pain was on her chest at the incision site and in her upper gums. All of her pain was rated a 9 out of 10. Her oral Dilaudid was increased; IV Dilaudid was started.

A pacemaker was put in place on October 24, 2011 (Tr. at 373-374). She had a normal ejection fraction (Tr. at 364). "She also has had difficulty with pain management and

14

the pain management team was consulted.  They did make changes to her regimen and she is now well-controlled. . . .  Much of her post-operative stay has been awaiting her INR[19] to become therapeutic. This has happened today and she is ready to be discharged to home with home health.”  Plaintiff had been ambulating the halls independently.  “Again her pain has been well-controlled and she is tolerating a regular diet.”  When discharged, plaintiff was told not to lift more than 10 pounds for the next 6 weeks, not to drive for 1 to 2 weeks “or while she continues with pain medications.”  Plaintiff was discharged with prescriptions for Fentanyl patch (schedule II controlled substance, an opioid pain reliever), Lidoderm patch (anesthetic), Loratadine (antihistamine), Oxycodone (schedule II controlled substance, an opioid pain reliever), Protonix (treats excess stomach acid), Topamax (prevents migraine headaches) as needed, Wellbutrin (antidepressant), and Warfarin (blood thinner).

Plaintiff was again hospitalized from November 7, 2011, through November 11, 2011, due to a low INR, meaning her blood was clotting too quickly (Tr. at 328-344).  This had been reported by a home health nurse.  “Before surgery she used to walk 1 mile per day, post op activity is limited [due to] pain.”  Plaintiff reported pain in her breast area where the pacemaker was inserted.  She denied shortness of breath or chest pain.  On exam her gait was stable, she had no edema in her legs, her upper breast area was “excruciatingly tender to touch.”  Her lungs were clear and she denied shortness of breath (Tr. at 336).  “She hd noticed

---

[19]Prothrombin time is usually measured in seconds -- the time it takes for blood to clot. This way of determining prothrombin time creates results that will vary depending on the laboratory and the method used to test the blood, but a sample range is approximately 10 to 14 seconds.  A number higher than average means it takes blood longer than usual to clot.  A lower number means blood clots more quickly than expected.  For people taking the blood-thinning medication warfarin (Coumadin), results are given as a number that represents a ratio called the international normalized ratio (“INR”).  The INR is a formula that adjusts for differences in the chemicals used in different laboratories so that test results can be comparable.  An INR range of 2.0 to 3.0 is generally effective for people taking warfarin who need full anticoagulation.

swelling and pain in her left breast on Sunday and it has been getting worse since that time. She attributes the pain to doing too much and working too much with her arms." Plaintiff had been folding laundry and unloading the dishwasher when her pain began (Tr. at 342). Plaintiff reported that she is a "special education teacher." (Tr. at 342). She complained that her current pain medication (which included Fentanyl patch [opioid], Lidoderm patch [anesthetic], Nortriptyline [antidepressant], and Oxycodone [opioid]) was not controlling her pain (Tr. at 342-343). Gillian Jones, M.D., wrote, "We would recommend a plastic surgery consultation for possible breast implant problems. The patient is scheduled to have an ultrasound. . . . We will follow up on that and recommend possible CT scan for further evaluation of the implants. There is no obvious abscess or fluid collection to drain. It would be inappropriate at this time to make an incision on a patient with implants." (Tr. at 341).

Plaintiff was seen by Pain Management while in the hospital. "I agree with current treatment. I would not recommend an increase in her opioids and also would not give but limited IV doses." (Tr. at 339). Plaintiff was treated with IV Heparin (blood thinner) and was discharged in stable condition. "Her pain has been under adequate control with her regimen per Pain Management. . . . She will be sent home on her pain medication regimen per Pain Service. I have also given her their number for outpatient follow up as she is unhappy with her pain management service that she is currently at." Plaintiff's discharge medications included Fentanyl patch (opioid), Lidocaine patch (anesthetic), Loratadine (antihistamine), Norco,[20] Nortriptyline (antidepressant), Oxycodone (opioid), Topamax (prevents migraines), Wellbutrin (antidepressant) and Warfarin (blood thinner).

On December 1, 2011, plaintiff was seen by Francisco Judilla, M.D., at Doctor's Hospital for a medication follow up (Tr. at 416-419). Plaintiff reported difficulty carrying out

---

[20]Norco is a schedule III controlled substance. It is an opioid pain reliever.

usual activities, fatigue, generalized aching, restlessness and sleeping problems. She described constant chest pain at rest or with activity, constant leg pain when walking a short distance, constant limitation of a joint, constant loss of muscle strength, intermittent muscle tenderness, constant back pain, constant joint pain, constant joint stiffness, constant joint swelling, constant weakness, easy bruising, headache, and numbness. Her pain medications included Fentanyl patch (opioid), Esgic,[21] Loratadine (antihistamine), Nortriptyline (antidepressant), Oxycodone (opioid), and Temazepam.[22] "Currently smokes an average of 7 per day." Dr. Judilla noted that plaintiff's gait was normal. "Patient able to undergo exercise testing and/or participate in exercise program." Her cervical spine was normal. She had tenderness and muscle spasm in her thoracic and lumbar spine. Plaintiff's judgment, insight, memory, mood, affect, speech, fund of knowledge, and "capacity for sustained mental activity" were all noted to be normal. She was continued on her medications. "Pt does not have PCP. Prescribe meds till she find[s] PCP." Dr. Judilla noted that plaintiff's heart surgeon put her on a high dose of narcotics. Dr. Judilla intended to begin decreasing her narcotics and indicated, "We will continue decreasing narcotics on next visit."

On December 14, 2011, plaintiff returned to see Dr. Judilla and complained of lower back pain (Tr. at 420-423). Plaintiff indicated her pain was a 5 out of 10 and had gotten worse. "Functional impairment is mild -- the patient is aware of it when present but it doesn't interfere with daily activities. Need for pain meds has not changed." Plaintiff indicated that she had not consulted with a medical provider "outside this group" regarding the pain since her last visit. Plaintiff reported constant chest pain, leg cramps and pain, limitation of use of a joint, loss of muscle strength, back pain, joint pain, muscle pain, joint stiffness, joint swelling,

---

[21]Esgic is a schedule III controlled substance. It treats tension headaches.

[22]Temazepam is a schedule IV controlled substance. It is a benzodiazepine.

and weakness, and she reported intermittent muscle tenderness. Plaintiff gait was observed to be normal. "Patient able to undergo exercise testing and/or participate in exercise program." Her cervical spine was normal. She had tenderness and muscle spasm in her lumbar spine. She had mild tenderness in her sacroiliac joint which was observed to be "stable." She had normal insight, normal judgment, normal mood, normal affect, normal fund of knowledge. Dr. Judilla noted that plaintiff's "lower back pain is stabilized with meds." He kept her on the same medications but decreased the dose of her Fentanyl patch (opioid) and increased her Esgic (barbiturate) from every 6 hours to every 4 hours as needed for pain. He refilled her Oxycodone (opioid).

On December 28, 2011, plaintiff saw Dr. Judilla for a follow up on lower back pain (Tr. at 424-427). Plaintiff reported that her lower back pain radiated into her left leg, interfered with her sleep and mobility, but interfered "only with some daily activities." Her pain was now constant which was an increase in frequency. Plaintiff was listed as a non-smoker and was off the nicotine patch. On exam plaintiff had normal breath sounds. Her gait was mildly antalgic. Her cervical spine was normal. She had tenderness and muscle spasm in her lumbar spine. Her sacral spine was normal to inspection but with moderate tenderness. Her sacroiliac joint was normal and stable. Tenderness was present in her right knee and lower leg, although an x-ray on that day showed that her knees were normal (Tr. at 432-433). X-ray of her lumbar spine showed loss of lumbar lordosis (loss of curvature of the spine) but no other abnormality (Tr. at 434). Her lumbar vertebrae were properly aligned, discs were normal, soft tissues were normal, sacroiliac joints were normal. Dr. Judilla observed that plaintiff's judgment was normal, insight was normal, mood and affect were normal and appropriate, fund of knowledge was normal. Dr. Judilla again decreased the dosage of plaintiff's Fentanyl patch and recommended plaintiff have a CT scan of her lumbar spine.

"Patient understands that we need to decrease her meds on next visit the dosage & number of pills."

On January 11, 2012, plaintiff saw Dr. Judilla for medication refills, follow up on chest and lower back pain, and a new complaint of having broken her middle toe on her right foot (Tr. at 428-431). Plaintiff described her back pain as an 8 out of 10 and said it interfered with most of her daily activities. On exam her lungs and heart were normal. Gait was normal. "Patient able to undergo exercise testing and/or participate in exercise program." Her cervical spine was normal. She had tenderness and muscle spasm in her lumbar spine. Sacroiliac joint was normal and stable. She had mild tenderness in her knees. Her judgment was normal, insight was normal, mood and affect were normal and appropriate to the situation, fund of knowledge was normal. She was assessed with "other and unspecified disorders of joint: pain in joint pelvic region and thigh" and lumbar radiculopathy. "Plan was to decrease 3 pills for pain to 1-2 different pill. Pt. refuses to go to 2 pills from 3 different pills. Discussed with pt. that I am not helping her anymore so she will look for another Doctor (PCP/Cardiologist) for her meds." Dr. Judilla prescribed two weeks' worth of medications.

On January 24, 2012, plaintiff saw Sanjaya Gupta, M.D., at St. Luke's Hospital for a follow up (Tr. at 437-438). She had a normal ejection fraction of 60%. Her entire cardiac exam was normal.

On January 26, 2012, plaintiff saw Pamela Davis, D.O., at Pleasant Hill Medical Clinic to establish care and get refills on her medications (Tr. at 763-766). Plaintiff reported "chronic low back pain from some disc bulges" although a month earlier her lumbar spine x-rays showed no disc bulges. She reported a history of migraine headaches. Plaintiff denied shortness of breath. Although she had consistently denied depression in the past, she reported depression and generalized anxiety disorder as past diagnoses. On exam bilateral decreased

breath sounds were observed.  Plaintiff's heart exam was normal.  Muscle tone, muscle strength, gait, stance, and balance were all normal.  Psychiatric exam was entirely normal. Plaintiff was assessed with migraine headache and chronic pain.  Dr. Davis prescribed Oxycodone (opioid), Fentanyl patch (opioid), Nortriptyline (antidepressant), and Esgic (barbiturate).  "Pt verbally agreed to chronic pain agreement with myself as the only prescriber, no lost or stolen prescriptions and random drug screening."

Five days later, on January 31, 2012, plaintiff returned to see Dr. Davis to discuss her medications (Tr. at 759-762).  "When she came in last Thursday, 1/26/12 she was given a refill of her Esgic (barbiturate), however, she believes that her dosage was not correct.  She doesn't believe that she was given enough pills for her to be dosed 2 tabs three times/day which is what she had been on previously.  She is currently having a migraine."  Examination of heart and lungs was normal.  Balance, gait and stance were normal.  Appearance, attitude, mood, affect, thought process and thought content were normal.  "I explained to patient that this is a rescue medicine not to be taken on a schedule as it is dependent and produces rebound headache when used as she is using it. Will give her some phenergan [for nausea] and take a couple of Tylenol when she has headache and wean off the regular use of the butalbital (Esgic, a barbiturate)."

On February 10, 2012, plaintiff returned to see Dr. Davis for cold symptoms and headache (Tr. at 755-758).  Plaintiff also complained of anxiety.  "She has tried to reduce her number of Esgic Plus and she gets panicked when she runs low."  Physical exam was normal, including gait and stance.  She was assessed with sinus infection was given an antibiotic and additional Esgic pills, and she was told to use Tylenol or Ibuprofen for pain and fever reduction.

On February 20, 2012, plaintiff saw Dr. Davis to follow up on her right middle toe (Tr. at 751-754). Plaintiff had stubbed her toe three weeks earlier, went to the emergency room the day before, and was told that it was broken. "She also wants to talk about chronic migraine headaches." Plaintiff had been trying to taper her Esgic to as needed but she said her headaches were becoming more severe. She said she was waiting to hear back from a neurologist about an appointment. Plaintiff had no chest pain or discomfort, no shortness of breath. She was assessed with closed fracture of her toe and migraine headache. She was prescribed Topamax (prevents migraines) and she was given a refill of Esgic Plus (barbiturate). "Will continue to wean the butalbital [Esgic] now to two a day and she will make an appt with neurology to discuss additional treatment."

On February 28, 2012, plaintiff saw Susan Opper, M.D., at St. Luke's for pain management (Tr. at 492-494). "The chief complaints are chest wall pain, chronic history of fibromyalgia, and lower back pain on chronic opioid therapy. . . . In regards to her chronic low back pain, for which she previously was seen at the Headache and Pain center, up until January of 2012, the patient does state that at this point in time the Headache and Pain Center no longer takes her insurance and therefore she is having to seek care with other pain management centers."

> In regards to the patient's fibromyalgia, the patient has tolerated nortriptyline [antidepressant] quite well, without any untoward side effects. She is currently on 100 mg p.o. [orally] at bedtime. The patient has been advised by her oncologist, Dr. Tietjen, to avoid Lyrica [treats fibromyalgia] and gabapentin [treats nerve pain] due to a history of renal cell carcinoma, status post partial left nephrectomy [removal of part of a kidney] in June of 2011. The patient also has had epidural steroid injections in regards to her degenerative disk disease and disk bulge reported in her lumbar spine more than 5 years ago, without any relief. Overall, the patient does feel like her pain is tolerable on her current pain medication regimen. She does understand that she will not be pain-free. Her primary care physician has requested that the pain management center take over prescribing narcotic therapy, as reported by the patient.

"Emotions are stable at this time." Plaintiff had 11 positive trigger points consistent with fibromyalgia. Dr. Opper assessed fibromyalgia, pain associated with pacemaker in the left chest wall, chronic back pain secondary to degenerative disk disease and disk bulge (no x-rays were consulted), and degenerative disk disease and disk bulge. Dr. Opper indicated she wanted to get plaintiff's records from the Headache and Pain Center including her imaging, and she wanted to get plaintiff's records from Dr. Williams[23] and Dr. Davis. "We will do an opioid risk tool with this patient, as well as a urine drug screen and urinalysis to determine if the patient's toxicology screen is appropriate for her current medication. We will contact the patient's primary care physician to further discuss the prescribing of the patient's chronic opioid therapy. I do believe that this is a stable opioid plan for the patient, without need for titration and this may be able to be done by her primary care physician. We do not recommend this patient's opioid therapy be titrated this point as the patient does have fibromyalgia and it is not indicated for this disease process. . . . We do recommend meditation as well as Tai Chi[24] for this patient."

On March 20, 2012, plaintiff saw Dr. Davis to discuss pain medications (Tr. at 744-747). "Pt here to discuss the management of her headaches. She takes 1 or 2 Esgic [barbiturate] and often gets relief to a dull pain but sometimes has to repeat the dose. . . . She was taking 6 Esgic a day and is now limited to 2." Plaintiff denied difficulty with fine

---

[23]The record which contain Dr. Williams's name are all electronically signed by Dr. Judilla; therefore, in this summary of medical records I have referred to Dr. Judilla.

[24]"Tai chi is an ancient Chinese tradition that, today, is practiced as a graceful form of exercise. It involves a series of movements performed in a slow, focused manner and accompanied by deep breathing. Tai chi, also called tai chi chuan, is a noncompetitive, self-paced system of gentle physical exercise and stretching. Each posture flows into the next without pause, ensuring that your body is in constant motion." http://www.mayoclinic.org/healthy-living/stress-management/in-depth/tai-chi/art-2000451 84

manipulative tasks. She reported no tingling, no numbness, no pain in her arms. On exam plaintiff had decreased range of motion in her cervical spine as well as muscle spasm. Her gait and stance were normal. "Pt began crying with palpation of her trapezius on the R which is very tight." She was assessed with cervicalgia (neck pain) musculoskeletal in nature. Dr. Davis recommended a cervical spine x-ray and a referral to the pain clinic for trigger point injections. Her Esgic was refilled but she was only permitted to take 1 every 12 hours. Home range of motion exercises were also recommended. "We again discussed the etiology of her pain and measures that may help instead of taking Esgic including her muscle relaxer, heat, biofreeze, massage."

Three days later, on March 23, 2012, plaintiff returned to see Dr. Davis for medication refills (Tr. at 740-743). Plaintiff reported that things were not necessarily better or worse with her neck pain. Dr. Davis observed that plaintiff "did not appear uncomfortable." Her balance was normal. Gait and station were normal. She had no decrease in fine motor speed. She had no tingling down her spine or arms. She was assessed with neck pain. Dr. Davis increased plaintiff's dose of Topamax (prevents migraines), refilled her Oxycodone (opioid, and prescribed Parafon Forte, a muscle relaxer. "Awaiting pain management appointment."

On March 28, 2012, plaintiff saw Dr. Opper at St. Luke's complaining of joint pain and headaches (Tr. at 489-490). "She was seen in the hospital, and the plan had been for her to go back to her primary care physician, but her primary care physician is now refusing to write her opioids and wants it all to be done by us. She has pain all over her body." Plaintiff rated her pain an 8 out of 10 constantly, "relieved with rest and medications somewhat." Plaintiff reported that her sleep was normal and her emotions were good.

> Records were reviewed from the Headache and Pain Center. It did appear that she was compliant at that time, but there is a note from a Robert Williams, who stated that he would no longer write her opioids as she was getting it from multiple physicians. The patient states that she was getting her fentanyl patch from Dr. Williams, but oxycodone

from the Headache and Pain Center because that is what he had told her to do. I am not sure about the story, but did have the patient sign an opioid agreement with laying out the rules for our practice. I also stated that I was not comfortable with her being both on Esgic as well as oxycodone, and my plan would be to wean her off of oxycodone if she continues to require Esgic. The patient did not bring her glasses, stated she was unable to read the contract, so I had the nurse read it to her and also recommended that when the patient comes in again to bring her pain medications with her. I did write for a fentanyl patch 100 mcg q. 72 hours, Esgic 2 t.i.d. (three times a day), and oxycodone 15 mg no more than 3 per day, and told her that that would be the last prescription for that that she would receive. . . .

On April 26, 2012, plaintiff saw Dr. Opper for joint pain and headaches (Tr. at 486).

Plaintiff reported increased joint pain due to her dosage of dopamine[25] being increased.

Plaintiff rated her pain a 5 to 7 out of 10. She was not sleeping well but her emotions were

stable. Dr. Opper refilled plaintiff's Fentanyl patch (opioid).

Refill patient's oxycodone [opioid] 15 mg 1 p.o. q. 8 h . p.r.n. [1 by mouth every 8 hours as needed] pain - maximum 3 per day - refill zero. The patient is on high amounts of Esgic [benzodiazepine], currently taking 2 tabs p.o. t.i.d. [by mouth three times a day] scheduled. We feel that this is a very high dose and will attempt to decrease the patient's daily intake. Will write the medication for p.r.n. [as needed] usage - maximum 4 per day. The patient was told that she might experience some withdrawal symptoms regarding this.

On May 24, 2012, plaintiff saw Dr. Opper for a follow up of chest wall pain (Tr. at

483-484). "This 48-year-old female is fairly stable with her chest wall pain. However, she

has a new problem involving her right hand that she wishes me to assess. She has had some

bumps arise on the right hand. . . . The patient has been doing quite a bit of gardening." The

bumps were "blister-like." Plaintiff described her chest pain as aggravated by stress and

activity. Plaintiff's sleep was better, activity was better. She was somewhat frustrated because

she had restarted smoking but quit again. Plaintiff was described as pleasant and cooperative.

"The patient appears calm without any pain behavior." Dr. Opper recommended calamine

lotion for plaintiff's hand. She refilled plaintiff's Fentanyl patch [opioid] and Oxycodone

---

[25]Treats circulation problems caused by heart attack, heart failure, kidney failure, low blood pressure, or surgery.

[opioid] (3 per day maximum). She increased plaintiff's Esgic [barbiturate] to 4 per day, up from 2 per day as prescribed the previous month.

The following day, on May 25, 2012, plaintiff saw Dr. Davis for the blisters on her hand (Tr. at 737-739). "For the last week the patient has had tiny red dots appear on her R hand mostly on the fingers. They are intensely itchy and the whole hand wants to swell. She has tried various OTC creams without relief." Plaintiff described her pain as a 10 out of 10 (Tr. at 739). She was observed to be in no acute distress. Her gait and stance were normal. She was assessed with dermatitis.[26] She was prescribed an antibiotic, Prednisone (a steroid to reduce swelling), and a topical medication.

On June 13, 2012, plaintiff saw Dr. Opper (Tr. at 480-481).

> [Patient] is here for her chronic opioid pain therapy. The has a number of pain complaints, chest pain, fibromyalgia pain, and also chronic migraines. She did see a neurologist but she states that the neurologist will not treat her until she has gotten all of the records from all of her many physicians. Evidently this has not happened yet. At any rate, Topamax [prevents migraines] is being tried, but the patient has had a lot of side effects with this and is not able to increase the dose because of increasing stiffness when she does. She was on 100 mg at night and added 50 mg in the morning, but is back to the 100 mg at night now. The patient is also on fentanyl patch [opioid]. She is complaining that it is difficult for it to stick, at times. She is using oxycodone [opioid] and she is also complaining that the Esgic [barbiturate] at the decreased dose is not very effective.

Plaintiff reported that her sleep is being interrupted and her emotions are "up and down." Plaintiff was described as pleasant and cooperative although "somewhat easily frustrated." No physical exam was performed other than checking vital signs. Dr. Opper assessed:

1.      Chronic opioid pain therapy for chest wall pain and chronic migraine headaches.

---

[26]Dermatitis is a general term that describes an inflammation of the skin. Although dermatitis can have many causes and occurs in many forms, this disorder usually involves an itchy rash on swollen, reddened skin.

2. History of fibromyalgia, history of hypertension, degenerative joint disease, renal cell cancer, diabetes mellitus, Meniere's, mitral valve replacement.

3. Numerous intolerances with medications in the past, as well as lack of effect. Lidoderm patch was not of help. Lyrica and gabapentin she was told to stop secondary to her partial nephrectomy.

> I had a long discussion with options for therapy including MS Contin[27] or methadone[28] for pain control. Because of her heart problems, I do not recommend methadone and morphine is an option, but the patient states that this has been tried in the past and has not been that helpful, but she will think about it. The patient requests an increase in Esgic [barbiturate], but I denied this. I went ahead and prescribed fentanyl patch [opioid] 100 mcg 1 q. 72 hours #10 to be dispensed on 6/23/2012. Esgic 1 to 2 q. 6 hours p.r.n. [every 6 hours as needed] maximum of 4 per day #120 with no refills. Oxycodone [opioid] 50 mg 1 q. 8 h. p.r.n. [every 8 hours as needed] #90. The patient stated that she should be getting 4 per day of oxycodone, but we checked the records and that has not been the case in the past. The patient urged to follow up with Neurology with regards to other options for migraine headaches. The patient states that primary care would like for me to write the Topamax. Ideally, this should be managed by her neurologist. I will be willing to take that over if this is something that the primary care does not feel comfortable in doing.

On July 7, 2012, plaintiff went to the emergency room at St. Luke's complaining of abdominal pain (Tr. at 577-603). She was admitted from that day until her discharge on July 18, 2012. Plaintiff's discharge diagnoses included infectious colitis,[29] history of small bowel obstruction, and poor oral intake.

> The patient was admitted, evaluated, and found to have colitis on a CT scan which was suspected to be infectious, with the patient's symptoms and clinical presentation. . . . Overall, the patient's course improved slowly. She was able to resume oral intake within approximately five to seven days from the time of her admission, and advance

---

[27]MS Contin is a schedule II controlled substance. It is a time-released form of morphine, an opioid pain reliever.

[28]Methadone is a schedule II controlled substance. It is an opioid pain reliever.

[29]Colitis is the medical term that describes inflammation of the colon, or large intestine. Infectious colitis is inflammation of the colon caused by an infectious agent. These include bacteria, viruses and parasites. Infectious colitis is usually a self-resolving condition, but it can be complicated by the symptoms of diarrhea, dehydration and bleeding.

slowly. The length of her discharge was related to the level of her pain, as the patient has significant amount of anxiety and abdominal pain with tolerance of oral pain medications. She was provided a Dilaudid [opioid] PCA[30] on admission, and took a significant number of days to wean from this PCA. She was eventually weaned several days prior to discharge to IV medications, and then her oral regimen in a slow fashion as not to produce withdrawal. The patient overall did tolerate this well. She was also using benzodiazepines, and was started on Celexa [antidepressant] for anxiety during this hospitalization, which she tolerated well. She was given a prescription for this on discharge. . . . I did recommend that she follow up with her primary care physician as an outpatient, along with her pain management specialists. I did suspect some abuse of pain medications and significant addiction, and the patient did mention to me during this hospitalization that she was seeking evaluation for disability, for which she may or may not qualify.

(Tr. at 577).

During her hospitalization, her lungs were normal on exam and via scans. Her extremities were normal on exam. A CT scan showed the same nonobstructive kidney stones in her right kidney. A CT of her pelvis showed that she had only "mild degenerative changes" of the visualized spine (Tr. at 599). On discharge she was given prescriptions for multiple medications including Fentanyl patch (opioid) 150 mcg (which is 1 and 1/2 times stronger than her previous prescription), Oxycodone (opioid) 15 mg 4 times per day up to 10 per day (she had been limited to 2 per day by Dr. Opper the month before), and Topamax (prevents migraines).

Two days after her discharge from the hospital, on July 20, 2012, plaintiff saw Dr. Opper "for chronic opioid pain therapy."

The patient has actually been hospitalized for 1 week with small bowel issues. . . . The patient was not provided any opioids for home use. She was given some during the

---

[30]Patient-controlled analgesia ("PCA") is a method of pain control that gives patients the power to control their pain. In PCA, a computerized pump called the patient-controlled analgesia pump, which contains a syringe of pain medication as prescribed by a doctor, is connected directly to a patient's intravenous ("IV") line. In some cases, the pump is set to deliver a small, constant flow of pain medication. Additional doses of medication can be self-administered as needed by the having the patient press a button. Other times, a patient can control when he or she receives pain medication and does not receive a constant flow.

hospital, however, she states that they increased her to 150 mcg from her 100 mcg Fentanyl patch [opioid], but then upon discharge she was to go back to 100 mcg. The patient is needing pain medication and requests a refill on her prescriptions.

Despite plaintiff's report to Dr. Opper, her hospital discharge records indicate that she was given a prescription for Fentanyl patch at the dose of 150 mcg, not 100 mcg, and that she was given a prescription for oral Oxycodone at a much larger daily dose than that prescribed by Dr. Opper a month earlier.

Plaintiff described her pain as a 6 to 9 on a scale of 1 to 10. She said her sleep was "very bad" and her emotion is "good". Dr. Opper observed that plaintiff was "pleasant and cooperative. She does not appear anxious at this time." Dr. Opper prescribed Fentanyl patch (opioid) 100 mcg, Esgic (barbiturate) up to 4 per day, and Oxycodone (opioid) 50 mg up to 3 per day which was an increase over the dose she prescribed a month ago.

Five days later, on July 25, 2012, plaintiff went to the emergency room complaining of nausea and vomiting (Tr. at 540-565). She was admitted and discharged 6 days later, on July 31, 2012.

Plaintiff said she had just been discharged from the hospital a week earlier. She tells me she as feeling better, she went home, however, developed worsening abdominal pain, and started having nausea, vomiting, and diarrhea again yesterday, and subsequently presented here. She denies eating anything abnormal. She tells me her pain is excruciating. The Dilaudid [opioid] does not seem to be helping it at this point. She actually underwent a CT scan which revealed resolution of her colitis and is really fairly unremarkable, and her labs were unremarkable.

(Tr. at 552). The Ct scan showed the same nonobstructive kidney stones in her right kidney which had not increased in size since January 19, 2011 (Tr. at 550). On exam her heart and lungs were normal. She was given IV Dilaudid (opioid) and injections of Dilaudid while in the hospital.

> A flexible sigmoidoscopy and EGD [were] performed, which showed some mild gastritis[31] and duodenitis,[32] as well as a hiatal hernia.[33] The sigmoidoscopy[34] was normal. She was treated with Protonix [reduces stomach acid] and Carafate [treats ulcers and other stomach problems]. . . . She had a gastric emptying study performed today, which is normal. She is eating and drinking and telling me that she does have a little bit of nausea but actually wants to go home today. This seems reasonable to me. She is advised to limit narcotic use.

(Tr. at 540). Plaintiff was discharged to normal activity as tolerated, and the records of her

hospitalization indicate that she was advised to limit her narcotic use as much as possible (Tr.

at 553, 555).

A week later, on August 8, 2012, plaintiff saw Dr. Davis (Tr. at 733-736). Plaintiff

complained of high blood sugar and shortness of breath with exertion. She denied chest pain,

---

[31]"Gastritis describes a group of conditions with one thing in common: inflammation of the lining of the stomach. The inflammation of gastritis is most often the result of infection with the same bacterium that causes most stomach ulcers. Injury, regular use of certain pain relievers and drinking too much alcohol also can contribute to gastritis. Gastritis may occur suddenly (acute gastritis), or it can occur slowly over time (chronic gastritis). In some cases, gastritis can lead to ulcers and an increased risk of stomach cancer. For most people, however, gastritis isn't serious and improves quickly with treatment."
http://www.mayoclinic.org/diseases-conditions/gastritis/basics/definition/con-20021032

[32]Duodenitis is inflammation of the duodenum, the first part of the small intestine located between the stomach and the middle part of the small intestine.

[33]"A hiatal hernia occurs when part of your stomach pushes upward through your diaphragm. Your diaphragm normally has a small opening (hiatus) through which your food tube (esophagus) passes on its way to connect to your stomach. The stomach can push up through this opening and cause a hiatal hernia. In most cases, a small hiatal hernia doesn't cause problems, and you may never know you have a hiatal hernia unless your doctor discovers it when checking for another condition. But a large hiatal hernia can allow food and acid to back up into your esophagus, leading to heartburn. Self-care measures or medications can usually relieve these symptoms, although a very large hiatal hernia sometimes requires surgery."
http://www.mayoclinic.org/diseases-conditions/hiatal-hernia/basics/definition/con-20030640

[34]Flexible sigmoidoscopy is a test that uses a flexible, narrow tube with a light and tiny camera on one end, called a sigmoidoscope or scope, to look inside the rectum and the lower, or sigmoid, colon. Flexible sigmoidoscopy can show irritated or swollen tissue, ulcers, and polyps (extra pieces of tissue that grow on the inner lining of the intestine).

tingling of the limbs, numbness of the limbs.  Plaintiff reported anxiety, chronic localized joint pain, and diarrhea.  On exam her heart and lungs were normal.  Her balance was normal; her gait was normal.  Dr. Davis assessed diabetes mellitus type 2 for which she prescribed Amaryl.  She also assessed Chronic Obstructive Pulmonary Disease for which she prescribed Valium (a schedule IV controlled substance, treats anxiety), Dulera (a steroid which prevents asthma attacks), and Spiriva inhaler.  She was told to use a "GI cocktail"[35] for her "intense esophageal pain."  No tests were done to determine plaintiff's lung function; therefore, it appears the COPD diagnosis was based on plaintiff's new complaints of shortness of breath.

Two days later, on August 10, 2012, plaintiff returned to see Dr. Davis for a follow up on diabetes (Tr. at 730-732).  "Spent 15 minutes with patient discussing diabetes and the mechanism of her medicine and importance of her diet."  Plaintiff was assessed with type 2 diabetes mellitus, "complicated, controlled."

A week later, on August 17, 2012, plaintiff saw Dr. Opper complaining of low back pain (Tr. at 474).  Dr. Opper noted that plaintiff "has been doing fairly well with her chronic back pain."  Plaintiff had been using too much of her oxycodone [opioid] and she ran out early.  Plaintiff said she was unhappy with the GI cocktail she was told to use for her hiatal hernia, but her "abdominal pain is stable."  Although plaintiff was having some difficulty getting to sleep, she had no difficulty staying asleep.  Her emotions were good.  Dr. Opper observed that plaintiff was "pleasant and cooperative. . . . She is very pleasant and conversive, with good attention to her personal appearance."  Dr. Opper continued plaintiff on her same medications and reminded her that she was permitted to take only 3 Oxycodone per day.  She was given prescriptions for Oxycodone, Fentanyl patch (opioid), and Esgic (barbiturate) up to 4 per day.

---

[35]A gastrointestinal cocktail, known as a GI cocktail, is a generic term for a mixture of liquid antacid, viscous lidocaine, and an anticholinergic primarily used to treat indigestion.

On September 14, 2012, plaintiff returned to see Dr. Opper (Tr. at 471-472). Plaintiff complained of low back pain and bilateral knee pain. She denied any side effects from her medication. She said her pain was aggravated with cold weather and walking. It was relieved with heat. Plaintiff reported problems with getting her medication. "She has been put on a family plan rather than individual with Medicaid and is having to pay for her prescriptions. The Ms Contin [opioid], she is only getting a 2 week supply at this time as she is unable to afford the full prescription. She did obtain a 2 week supply from Dr. Elliott 2 weeks ago and requests one more prescription for a 2 week supply of the MS Contin, but a full month supply of the Esgic [barbiturate] and oxycodone [opioid]." Dr. Opper described plaintiff as pleasant and cooperative with no mood disturbances. "She appears upbeat today. She is able to walk without assistance." Dr. Opper refilled plaintiff's MS Contin, Esgic, and Oxycodone.

On October 11, 2012, plaintiff saw Dr. Opper for a follow up (Tr. at 467). "She is doing fairly well today, although she is thinking about undergoing disability." Plaintiff reported that she wakes up every 2 hours. Dr. Opper observed that plaintiff was "pleasant and cooperative [with] no pain behavior." No physical exam was performed. Dr. Opper continued plaintiff's MS Contin (opioid), Esgic (barbiturate), and Oxycodone (opioid).

On November 8, 2012, plaintiff saw Dr. Opper for a follow up (Tr. at 464-465). "The patient is doing very, very well on this visit. . . . She feels that her migraine headaches are under good control." Plaintiff reported that her sleep was "so-so" but she was able to sleep. She was using nortriptyline (antidepressant) at night "which is helpful. . . . emotions are fairly good. She is going to Florida next week with her daughter. . . . The patient is awake, alert, pleasant, cooperative. She is able to walk without assistance. Mood is very upbeat and pleasant." Dr. Opper refilled plaintiff's pain medications and recommended China Gel for plaintiff's joints.

One week later, on November 15, 2012, plaintiff went to St. Luke's due to coughing up blood (Tr. at 500-513). Her INR had been fluctuating the past couple of days. Chest x-ray was normal, echocardiogram showed that her pacemaker was operating normally. Plaintiff was admitted overnight to monitor her anticoagulation. She did not cough up any blood after admission. Plaintiff denied any problems other than generalized muscle aches, fatigue and migraine headaches. She specifically denied depression (Tr. at 513). It was determined that plaintiff's coughing up blood was mostly likely due to her recent prescription for an added anticoagulation medication. The cardiologist recommended that she use the brand-name Coumadin rather than a generic and to have her INR checked every 2 days. She was discharged the following day, "activity as tolerated." Plaintiff indicated that she was supposed to go on vacation next week and she was told to speak to her cardiologist before leaving.

On November 20, 2012, plaintiff went to St. Luke's complaining of renewed coughing up blood, nausea, and chest pain (Tr. at 609-639). Plaintiff had resumed smoking. She said she had been diagnosed with COPD and was given a prescription for Dulera "but she is not taking that." (Tr. at 612). A CT scan showed new multifocal airspace and nodules in the lungs. It was recommended that she have another CT scan in 3 months to follow up on those (Tr. at 637). Chest x-rays revealed that plaintiff's "skeletal structures are within normal limits." (Tr. at 638). On exam it was determined that he chest pain was noncardiac in nature. Carlos Rivas-Gotz, M.D., recommended that plaintiff not use Lovenox (blood thinner) for bridging while trying to regular her INR but should instead use Heparin (blood thinner). "Would reevaluate and have the patient reeducated by dietary on certain nutritional things that may change her INR." She was discharged on November 25, 2012, and told to stop smoking.

Two days later plaintiff went to Florida (Tr. at 641).

On December 6, 2012, plaintiff saw Dr. Opper for a follow up (Tr. at 641-642). "She is doing fine with her pain medications and has very infrequent headaches." Plaintiff said her pain was predominantly in her back. "Emotions fairly good although she misses her family who is in Florida [and she] would like to move there." Dr. Opper observed that plaintiff's mood was very upbeat and she was able to walk without assistance. No examination was performed. Plaintiff's narcotic pain medications were refilled.

On December 31, 2012, plaintiff saw Jennifer Elliott, M.D. (Tr. at 644). "The patient states that her lower back pain is currently controlled with her current medications. . . . The patient also states that she has frequent headaches which are controlled with the medication Esgic. She denies having any side effects or new complaints at this time." Plaintiff said her sleep was okay. Emotionally she felt good. Her pain medications were refilled.

On January 29, 2013, a little before noon plaintiff saw Dr. Elliott for a follow up (Tr. at 645-646). "She reports that her pain has been fairly stable since her last visit." She rated her a pain a 2 or 3 out of 10. Plaintiff's sleep was "so-so", she was having some increased fatigue, she denied any medication side effects. Her pain medications were refilled without change. That afternoon she had a chest x-ray which showed stable life support devices and no acute cardiopulmonary process (Tr. at 682). Her lungs were stable with normal pulmonary vasculature.

The following day, on January 30, 2013, plaintiff went to the emergency room complaining of worsening chest pain, and it was determined that her INR was again elevated (Tr. at 651-681). Her INR had been as low as 0.9 on January 7, 2013, and as high as 8.2 on January 29, 2013. In the emergency room it was even higher, at 8.8. She was also noted to have severe anemia. Plaintiff was given 2.5 mg of Vitamin K and her INR dropped

dramatically to 2.8.  Initially it was suspected that plaintiff was losing blood through her gastrointestinal system causing her "widely fluctuating INRs."

There is a question that the patient may be misusing her Coumadin to affect her INR to get admitted to the hospital.  She has depression and anxiety and has been irritated and confused during this admission. . . .

Upon evaluation, the patient was extremely irritable.  She was moving around in her bed, standing up, and sitting down.  She said that she was admitted to the hospital for "chest pain, I had some shortness of breath, and I've been really tired lately."  The patient stated that she had a difficult day yesterday with her daughter and stated that they got into an altercation.  She said that her daughter created a scene in the hospital.  Per nursing staff, security was actually called to break up the fight and to have the daughter removed from the room.  The patient stated that she has been dealing with a lot of stress lately because she has chronic pain.  She had a history of having open heart surgery and kidney cancer, and she said that even though she has been in remission for 3 years with her kidney cancer, she has a poor quality of life.  The patient stated that she was confused yesterday, and did admit to that, but stated that the reason for that was that she had taken her pain medications from home prior to coming to the emergency department and was given more pain medications in the emergency department.  The patient stated that the medication interacted and created her confusion.  Per nursing staff, the patient seems to have many different explanations for things and excuses for her fluctuating INR.  The patient stated that the stays home all day and watches Lifetime TV and movies.  During the commercials, she will actually do some housework, cleaning, or cooking.  The patient notes having decreased energy every day.  Her appetite varies.  She snacks throughout the day lately and her children and husband force her to eat dinner with them every evening.  She says she has been feeling depressed for the past several months and has crying spells occasionally.  She also says her anxiety has been elevated, and she has been having panic attacks daily.  She denies any auditory or visual hallucinations, delusions, or paranoia. The patient denies any history of manic episodes as well.

\* \* \* \* \*

SUBSTANCE ABUSE HISTORY:  The patient denies smoking cigarettes. . . .  There is some concern that she may be overtaking her pain medications. . . .

IMPRESSION:
     1.     Mood disorder, not otherwise specified.  Difficult to tell, given the fact that the patient is likely suffering from delirium.
     2.     Delirium due to multiple causes, including pain medications, noncompliance with medications, and possibly Coumadin [blood thinner] and other medications as well.
     3.     Rule out fictitious disorder or Munchausen, given the fact that the patient may be altering her medications to get admitted and has a history of multiple admissions recently.
     4.     Rule out possible prescription drug abuse, given the fact that the patient may be self-medicating with her prescription drugs to alter her state of mind.

(Tr. at 654-655). It was recommended that Ativan[36] and Haldol[37] be added to plaintiff's medication regimen for anxiety while in the hospital. She was told to follow up with a psychiatrist and make an appointment for counseling.

Mikhail Kosiborod, M.D., noted that plaintiff has no coronary disease "and in fact, had a coronary angiogram prior to surgery which did not reveal any significant coronary artery lesions aside from minor luminal irregularities." (Tr. at 661). Dr. Kosiborod noted that plaintiff had been seen 4 days ago by Dr. Sanjaya Gupta who noted plaintiff was tachycardic and prescribed a low dose beta blocker. "The etiology of tachycardia was not clear at that time."

On February 25, 2013, plaintiff saw Dr. Opper for a follow up (Tr. at 786). Plaintiff reported that her pain had been stable in the last few months. Her sleep was unchanged. Her emotions were good. She denied medication side effects. Dr. Opper observed that plaintiff was able to ambulate around the room. No further examination was done. All of plaintiff's pain medications were refilled.

On March 4, 2013, plaintiff saw Dr. Davis for medication refills (Tr. at 726-729). Plaintiff had been off Topamax for the past week. Plaintiff was diagnosed with a sinus infection, chronic superficial gastritis, and neck pain. Her Topamax was refilled.

On March 22, 2013, plaintiff saw Dr. Elliott for a follow up (Tr. at 783). "Currently, she believes her pain medication is adequately controlling her pain, however, she does state that her headaches are uncontrolled with the current dose of Esgic [barbiturate]. . . . Emotionally, she says that she feels pretty good." Plaintiff's narcotic prescriptions were refilled,

---

[36]Ativan is a schedule IV controlled substance. It is a benzodiazepine.

[37]Haldol treats schizophrenia.

and her Esgic was changed to Esgic-Plus (contains acetaminophen and caffeine as well as the barbiturate).

On March 25, 2013, plaintiff saw Dr. Davis (Tr. at 770-773). Plaintiff's blood sugar had been running high. "Appetite is low, does not eat 3 meals daily." Plaintiff was taking no diabetic medication at the time. Plaintiff reported numbness and tingling in her feet. She was diagnosed with type 2 diabetes mellitus, uncomplicated, uncontrolled. She was told to take Amaryl as directed. Dr. Davis also prescribed a low dose of Sulfonyrea and warned plaintiff not to skip eating while taking that medication.

On April 11, 2013, plaintiff saw Dr. Opper (Tr. at 779-780). Plaintiff reported a week-long headache and increasing back pain. "The activities that she is able to do with pain medications include ability to cook, do some cleaning, and to go to church." Plaintiff denied medication side effects. Dr. Opper observed that plaintiff had a tendency to overuse Esgic on bad days. "The patient is awake and alert, pleasant and cooperative. Good attention to her personal appearance." Plaintiff was able to walk without assistance.

> I did discuss the fact that because she is on morphine [opioid] and oxycodone [opioid] with Esgic [barbiturate] she is at increased risk of some respiratory depression. I did recommend weaning if able as I am concerned that her migraines and daily headaches may be exacerbated by the change in flux of her short-acting medications. I felt that if we could get her down to a lower dose it might be better for her overall, although initially I expect an increase in her pain. I also discussed therapy for sleep disorder including some tips for going to bed and staying asleep without medication management for this. I recommended that she buy the book, "Managing Pain Before It Manages You" to utilize some techniques besides pain pills for her overall health. I did discuss the risks of being on long-term opioid therapy including decrease in estrogen, change in natural endorphins, stress hormones, and I did recommend that she not drive while taking her medication.

Dr. Opper refilled plaintiff's MS Contin (opioid), Oxycodone (opioid), and Esgic (barbiturate) "to be dispensed on 4/21/2013, which would be 30 days after the last prescription was written."

*C.*     *SUMMARY OF TESTIMONY*

During the April 2, 2013, hearing, plaintiff testified; and Jennifer Teixeira, a vocational expert, testified at the request of the ALJ.

1.     **Plaintiff's testimony.**

At the time of the hearing, plaintiff was 49 years of age (Tr. at 28). She is 5'4" tall and weighs 110 pounds (Tr. at 33). Plaintiff lives with her ex-husband, and they have lived together for the past nine years (Tr. at 28). Plaintiff's ex-husband is employed full time as a local truck driver (Tr. at 28). He switched to local routes several years ago because of plaintiff's condition (Tr. at 28-29).

In 2011 plaintiff worked as a certified nursing assistant and as a private nurse (Tr. at 29). She was asked to leave both jobs because she could not be there on a full-time basis (Tr. at 29). Plaintiff missed work due to lower back pain and difficulty breathing prior to her open-heart surgery (Tr. at 29, 46). Plaintiff had a valve replacement and a pacemaker (Tr. at 30). After her surgery her breathing problems did not improve because of COPD (Tr. at 30). Plaintiff stopped smoking six months before her heart surgery (Tr. at 30).

Prior to her surgery, any exertion at all would affect her breathing, and chest pain kept her from doing any physical labor (Tr. at 30). She needed to rest at least once an hour (Tr. at 30). After her surgery, she continues to have chest pain every day (Tr. at 31). Any exertion causes her to have a hard time breathing, she gets very dizzy, and she has to sit down and rest (Tr. at 33). Any excitement "more than just a calm environment" causes her heart to tighten, she has a very difficult time breathing, and she has "horrible chest pain" (Tr. at 40). Prior to her heart surgery she had a pulmonary function test and she did not perform as well as expected (Tr. at 40-41). Plaintiff has never been told that her chest pain and lung problems are related to her smoking (Tr. at 41). Even though plaintiff's medical records show normal

heart function, she believes she has had "a difficult time with the valve and the pacemaker" (Tr. at 41). Plaintiff does not use oxygen but testified that "it is being considered at this time" (Tr. at 41).

In 2010 plaintiff had a kidney removed and she has "very bad pain days" around where the incision was made (Tr. at 42). Plaintiff has seen a doctor about that and was told that "they did cut through quite a bit of nerves" and that there is no way to perform that surgery without the patient having difficulty afterward (Tr. at 42). Plaintiff is also having difficulty with her hands -- she is losing feeling and she cannot lift a glass without dropping it (Tr. at 42). Plaintiff is also losing the feeling in her feet and heels (Tr. at 43). Her neurologist, Dr. Crandall, has referred her to a podiatrist for that (Tr. at 43). She had not seen a podiatrist yet at the time of the hearing (Tr. at 43). Plaintiff's hand problem had been going on for about 8 months and she had been instructed to wear braces (Tr. at 43). She had a nerve conduction test done and was told her hand problem is due to the disc replacement she had done in her neck 15 years ago (Tr. at 43-44).

Plaintiff uses only one pharmacy to prevent any misunderstanding or misuse of narcotic medication (Tr. at 42). Her medication causes extreme fatigue and she does not sleep well at night due to being in so much pain (Tr. at 45). Plaintiff spends most of her time lying down and resting because she is in too much pain to do anything else (Tr. at 45). She lies down about 7 hours out of an 8-hour workday (Tr. at 51). Plaintiff's ex-husband does all of the laundry, cleaning, yard work, etc. (Tr. at 45).

Plaintiff has had a lot of difficulty the past two years with memory and went to the hospital on one occasion because she was confused and disoriented (Tr. at 45). Plaintiff has low self-esteem and is suffering from depression due to her medical conditions (Tr. at 48). It has been recommended that she start seeing a psychiatrist (Tr. at 48).

Plaintiff does not recognize a Dr. Katherine Cole who reported in plaintiff's medical records that plaintiff was noncompliant with medication (Tr. at 32). Plaintiff does not know who Dr. Cole is and indicated that she has been compliant with medication (Tr. at 32).

Plaintiff can sit for up to 45 minutes at a time, she can stand for 10 minutes at a time before she experiences back pain, she can walk a block at a time on a good day, and she can lift and carry no more than 5 pounds (Tr. at 33-34). Plaintiff has a driver's license and drives once or twice a week (Tr. at 34). It is about 16 miles from her house to the hospital where she has blood work done every week (Tr. at 34).

Plaintiff sees Dr. Crandall once a month (Tr. at 34). She disagrees with Dr. Crandall's note that plaintiff was doing "very, very well" with her back pain and knee pain (Tr. at 35). Plaintiff described her average back pain as a 9 out of 10 all the time even with medication (Tr. at 36-37).

Plaintiff cannot shower without the assistance of her ex-husband (Tr. at 37). Plaintiff last used a cane in October 2011 (Tr. at 38). Plaintiff does not exercise because it is too difficult (Tr. at 39). Plaintiff does not recall being able to undergo exercise testing and participating in exercise programs in January 2012 as reflected in Dr. Judilla's records (Tr. at 39).

## 2. Vocational expert testimony.

Vocational expert Jennifer Teixeira testified at the request of the Administrative Law Judge. Plaintiff's past relevant work includes customer service representative, sedentary, skilled with an SVP of 5; gas station cashier, light, unskilled with an SVP of 2, and care giver, medium, semi-skilled with an SVP of 3 (Tr. at 46-47).

The first hypothetical involved a person limited to simple, routine, unskilled work; standing and walking 4 hours per day; sitting 4 hours per day; occasional balancing problems;

could occasionally climb stairs and ramps but could never climb ladders, scaffolds or ropes (Tr. at 49). The vocational expert testified that such a person could not perform any of plaintiff's past relevant work but could work as an order clerk, DOT 209.567-014, with 4,440 in Missouri and 211,370 in the country (Tr. at 49-50). The person could work as a document preparer, DOT 249.587.018, with 4,802 in Missouri and 2,798,000 in the country (Tr. at 50).

The second hypothetical involved a person who would need to lie down at least 7 hours between 8:30 a.m. and 5:00 p.m. (Tr. at 51). Such a person could not work (Tr. at 52). Any person who would need to take unscheduled breaks cannot perform unskilled work (Tr. at 52).

## V.    *FINDINGS OF THE ALJ*

Administrative Law Judge Raul Pardo entered his opinion on April 25, 2013 (Tr. at 12-20). Plaintiff's last insured date was March 31, 2012 (Tr. at 14).

Step one. Plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 14).

Step two. Plaintiff suffers from the following severe impairments: status post mitral valve replacement, anemia, chronic obstructive pulmonary disease, and a back impairment (Tr. at 14). Plaintiff's mild gastritis, duodenitis, type II diabetes, and hiatal hernia are medically determinable impairments but are not severe (Tr. at 15). Plaintiff's migraines are well-controlled with medication, and the record does not establish that plaintiff suffered from limitations due to migraine headaches for 12 consecutive months (Tr. at 15). Plaintiff's mental impairment is not severe (Tr. at 15-16).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 16).

Step four. Plaintiff retains the residual functional capacity to perform sedentary unskilled work. She can stand or walk for four hours per day; sit for four hours per day; can occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; and "has

40

occasional balancing problems." (Tr. at 16). With this residual functional capacity, plaintiff cannot perform her past relevant work as a customer service representative, gas station cashier, or care giver (Tr. at 18).

Step five. Plaintiff is a younger individual with a high school education and can communicate in English (Tr. at 19). With her residual functional capacity, she is capable of working as an order clerk or a document preparer, both available in significant numbers in the regional and national economy (Tr. at 20).

## VI.   CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

## A.   CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work

record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> In terms of the claimant's limitations due to pain and fatigue symptoms, the claimant's description of limitations is so extreme as to appear implausible, as she testified she would have to lie down for seven hours out of an eight-hour workday. The general perception from the claimant's testimony was that her description of her symptoms was exaggerated. This was also the conclusion of the state agency medical consultant. The claimant's reports of symptoms that are documented in the medical records are not close to the same severity as those from her hearing testimony. This inconsistency weighs against the credibility of her allegations.

> The claimant's medical records are inconsistent with her allegations. The undersigned notes that the claimant did have a cardiac surgery, mitral valve replacement in October 2011, however, the records since that time do not support continued disabling limitations. Although the claimant reported being able to do very little in terms of activity, in November 2011, the claimant attributed some of her pain symptoms to "doing too much and working too much with her arms," which included folding laundry and unloading the dishwasher. In December 2011, the claimant was noted to be able to undergo exercise testing and/or participate in an exercise program. In December 2011, the claimant reported that her pain did not interfere with her daily activities. The claimant reported her pain levels at no more than a four in August 2012. Although the claimant testified that she basically does very little except lay [sic] down all day long, she was still apparently able to go to Florida on vacation in November 2012. She reported at that time that she was "doing fine" with her pain medications and had very infrequent headaches. The claimant's records do not show persistent problems with shortness of breath, and although she does carry a diagnoses

of chronic obstructive pulmonary disease (COPD), the claimant's treatment records do not suggest her impairment was of sufficient severity to cause the degree of symptoms she has alleged. The claimant was not apparently even taking any medication for COPD, which suggests her symptoms were not very limiting. These records do not match up with the claimant's extreme allegations and weigh against the credibility of her allegations.

The claimant's objective findings from medical testing do not support her allegations. A radiograph of the claimant's spine in December 2011 showed loss of lumbar lordosis but no other abnormality. The claimant's echocardiogram does not show significant continued cardiac problems, as she was noted to have normal left ventricular systolic function in November 2012 with no significant change compared to the January 2012 study.

(Tr. at 17-18).

## 1.     PRIOR WORK RECORD

Plaintiff's work record does not support her credibility. She earned over $8,000 only two years in her life, and during 12 years since she started working she earned less than $2,000. There are many years when plaintiff's earnings were zero. Her earnings record does not support her credibility.

## 2.     DAILY ACTIVITIES

Plaintiff was able to go to Florida on vacation after her alleged onset date. Several days after she was discharged from the hospital after undergoing mitral valve replacement and pacemaker implantation, she was able to fold laundry and unload her dishwasher. In May 2014 she had been doing "quite a bit of gardening." In January 2013, she said she was able to do housework and cooking while watching television. In April 2013 she was able to cook, clean, and go to church. These daily activities are inconsistent with the extreme limitations to which plaintiff testified.

## 3.     DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

Although plaintiff testified to nerve trouble resulting in her dropping things and needing to wear braces, the record shows that she had no difficulty with fine manipulation on

March 20, 2012, and March 23, 2013.  In August 2102, she denied numbness and tingling in her hands.

The record reflects that plaintiff has complained of very severe pain in her back and abdomen, but the medical tests do not support an objective basis for this pain.  X-rays and CT scans have showed no disc bulges, and no other abnormalities in her spine other than a minimal loss of curvature.  Her cervical spine exams were normal on September 29, 2011; December 1, 2011; December 14, 2011; December 28, 2011; and January 11, 2012.  In fact, there is no medical record showing any abnormality to plaintiff's cervical spine.

The records do reflect that plaintiff's addiction to opioid pain medication and barbiturates have caused her anxiety, rebound headaches, and suspected deliberate misuse of blood thinning medications in order to be admitted to the hospital for additional narcotic pain medication.  This does not support her credibility.

## 4.     *PRECIPITATING AND AGGRAVATING FACTORS*

As mentioned above, plaintiff's addiction to prescription pain medication precipitates her anxiety and headaches.  Cold weather was alleged to have aggravated her pain; however, plaintiff told her doctor that the warm weather in Florida did not improve her pain.

## 5.     *DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION*

Despite plaintiff's doctors indicating that her symptoms were adequately controlled with her mediation, she continued to obtain prescription pain medication from more than one source and by her frequent admissions to the hospital for additional pain medication.

## 6.     *FUNCTIONAL RESTRICTIONS*

The only function restrictions in the record are for the time immediately after surgery. Plaintiff was advised not to drive while on prescription pain medication and despite taking very large doses of pain medication daily, she continues to drive.

### B.    CREDIBILITY CONCLUSION

In addition to the above factors, I note that after having been discharged by Dr. Judilla for refusing to reduce narcotic pain medicine, plaintiff established care with Dr. Davis and said she had back pain due to bulging discs, even though her x-ray a month earlier showed no disc bulges.  Plaintiff told Dr. Opper in February 2012 that she had bulging discs and degenerative disc disease even though her x-rays from 2 months earlier showed that she did not have those conditions.  On May 25, 2012, plaintiff described her hand pain as a 10 out of 10, but Davis noted that plaintiff appeared to be in no distress.  On October 11, 2012, plaintiff was noted to be doing fairly well with no pain behavior.  On November 8, 2012, it was noted that plaintiff was doing "very, very well on this visit."

Further, the record is replete with evidence of drug-seeking behavior.  When told by Dr. Stewart that plaintiff would need mitral valve replacement, plaintiff's concern was with post-operative pain management.  She had to stay in the hospital an extra day due to pain, while she was using IV Dilaudid every two hours, due to having her teeth pulled.  Plaintiff reported that she had an adverse reaction to epidural steroid injections in the past and has been advised not to get them, and her back pain is presumably why she was on massive doses of opioid pain relievers.  Yet there are no medical records substantiating this adverse reaction or recommendation by any doctor not to get epidural steroid injections.  Furthermore, in February 2012, plaintiff told Dr. Opper that she had had epidural steroid injections in the past but got no relief from them, not that she had an adverse reaction.

Dr. Judilla announced on December 1, 2011, his intention to begin decreasing the high doses of narcotics plaintiff's heart surgeon had prescribed.  Dr. Judilla began decreasing the dose of prescribed narcotics on December 28, 2011.  On the next visit, January 11, 2012,

plaintiff described her pain as an 8 out of 10 (even though there was no medical basis for her pain) and refused to decrease her medication. Dr. Judilla told her to find another doctor.

On January 31, 2012, plaintiff told Dr. Davis she had not been given enough Esgic; however, Dr. Davis told her Esgic was not to be used on schedule but only as needed or it would produce rebound headaches and it is addictive. On March 28, 2012, Dr. Opper asked plaintiff to sign an opioid agreement but plaintiff claimed she could not see the agreement because she didn't have her glasses. On June 13, 2012, plaintiff told Dr. Opper she was supposed to get 4 Oxycodone per day, but Dr. Opper checked the medical records and saw that plaintiff had only been getting 2 per day. A few days later, plaintiff was admitted to the hospital for 11 days and it was noted that the length of her stay was related to the level of her pain. She was using a Dilaudid PCA and used a large amount of that opioid. It took a "significant number of days" to wean her from the PCA. The treating doctor suspected abuse of pain medications and "significant addiction."

The following month, plaintiff went to hospital and stayed for 6 days complaining of excruciating pain. She was on IV Dilaudid during her entire stay, even though her CT scan was unremarkable, labs were unremarkable, and no doctor was able to determine a medical reason for plaintiff's excruciating pain.

On August 17, 2012, it was noted plaintiff was using too much Oxycodone and had run out early. On January 30, 2013, it was suspected that plaintiff was purposely misusing her blood thinner to get admitted to the hospital for more narcotic pain medicine. On April 11, 2013, Dr. Opper noted that plaintiff had a tendency to overuse Esgic. She told plaintiff it would be better for her overall if she would reduce her dose of controlled medications.

Based on the substantial evidence in the record as a while, I find that the ALJ's decision to find plaintiff's subjective complaints not credible is wholly supported.

## VII.    SEVERE MENTAL IMPAIRMENT

Plaintiff argues that the ALJ erred in finding that plaintiff's mental impairment is not severe.

A severe impairment is an impairment or combination of impairments which significantly limits a claimant's physical or mental ability to perform basic work activities without regard to age, education, or work experience. 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The regulations, at 20 C.F.R. § 404.1521, define a non-severe impairment.

(a)    Non-severe impairment(s).  An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.

(b)  Basic work activities.  When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs.  Examples of these include--

(1)    Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

(2)    Capacities for seeing, hearing, and speaking;

(3)    Understanding, carrying out, and remembering simple instructions;

(4)    Use of judgment;

(5)    Responding appropriately to supervision, co-workers and usual work situations; and

(6)    Dealing with changes in a routine work setting.

Plaintiff bears the burden of establishing that an alleged impairment is severe.  <u>Caviness v. Massanari</u>, 250 F.3d 603, 604-605 (8th Cir. 2001).  While severity is not an onerous requirement, it is not a "toothless standard," and claimants must show more than minimal interference with basic work activities.  <u>Kirby v. Astrue</u>, 500 F.3d 705, 708 (8th Cir. 2007).  To be considered severe, the impairment "must result from anatomical, physiological, or

psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. . . and must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms." Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (quoting 20 C.F.R. § 404.1508).

The ALJ had this to say about plaintiff's mental impairment:

> In terms of the claimant's alleged depression symptoms, the claimant's medical records do not show she complained of depression symptoms, and the claimant's anxiety symptoms were apparently well controlled with medications as she needed that her "emotion is good." The claimant's allegations of symptoms in this area were vague, and as noted in an earlier finding, the record does not support finding more than mild limitations as a result of mental impairment.

(Tr. at 17).

The medical records do not support a finding that plaintiff suffered from a severe mental impairment. On November 16, 2009, Dr. Walker noted that plaintiff's hygiene and grooming were normal, insight was normal, judgment was normal, memory was normal, concentration was intact. Mental status exam was normal except plaintiff was irritable and angry and she had severe occupational problems at the time.

On December 4, 2009, Dr. Walker noted good grooming, good hygiene, good eye contact, normal speech, normal thought process, full affect, congruent mood, normal insight, normal judgment. No abnormal mental findings were observed.

On January 8, 2010, Dr. Walker noted good grooming, good hygiene, good eye contact, normal psychomotor activity, normal speech, normal thought process, full affect, normal mood, normal insight, normal judgment. No abnormal findings were noted.

On February 4, 2010, Dr. Walker noted OK mood despite plaintiff worrying about kidney cancer. Her grooming and hygiene were good, eye contact was good, psychomotor activity was normal, speech was normal, thought process was normal, affect was full, mood was normal, insight was normal, judgment was normal.

On August 14, 2011, her psychological exam at St. Luke's Hospital emergency room was normal. On August 16, 2011, plaintiff denied any mental symptoms.

The records are similarly devoid of evidence of a mental impairment after plaintiff's September 10, 2011, alleged onset date. On September 29, 2011, Dr. Judilla noted a negative psychiatric history. Plaintiff's judgment was normal, insight was normal, mood and affect were normal and appropriate.

On September 30, 2011, plaintiff denied depression to Dr. Stewart. On December 1, 20112, Dr. Judilla noted normal judgment, insight, memory, mood, affect, speech, fund of knowledge, and capacity for sustained mental activity. On December 14, 2011, Dr. Judilla noted normal insight, judgment, mood, affect, and fund of knowledge. On December 28, 2011, Dr. Judilla noted normal judgment, insight, mood, affect, and fund of knowledge. On January 12, 2012, Dr. Judilla noted normal judgment, insight, mood, affect, and fund of knowledge. On January 26, 2012, plaintiff told Dr. Davis she had a past diagnosis of depression; however, her psychiatric exam was entirely normal. On January 31, 2012, plaintiff's mood, affect, thought process, thought content, appearance, and attitude were all normal.

On February 28, 2012, plaintiff's emotions were stable. On March 28, 2012, her emotions were good. On Aril 26, 2012, her emotions were stable. On May 24, 2012, she was noted to be pleasant and cooperative. On June 13, 2012, she said her emotions were up and down, but she was complaining about her decreased pain medications not working well. She was observed by Dr. Opper on that day to be pleasant and cooperative but easily frustrated.

On July 20, 2012, Dr. Opper observed that plaintiff was pleasant and cooperative, not anxious. Plaintiff said her emotion was good. On August 17, 2012, plaintiff's emotions were good. She was observed to be pleasant and cooperative, conversant, with good attention to

personal appearance.  On September 14, 2012, plaintiff was pleasant and cooperative with no mood disturbances, and she was described as "upbeat."  On November 18, 2012, plaintiff saw her emotions were fairly good.  She was observed to be pleasant and cooperative with a "very upbeat mood."  On November 15, 2012, plaintiff denied depression.  On December 6, 2012, plaintiff said her emotions were fairly good except she missed her family in Florida.  Her mood was "very upbeat."  On December 31, 2012, plaintiff said she felt good emotionally.

On January 30, 2013, while in the hospital plaintiff had a psychiatric evaluation due to the doctor suspecting plaintiff purposely misused her blood thinner to get admitted to hospital for pain medication. Plaintiff reported feeling depressed lately with crying spells.  On her next medical visit, February 25, 2013, she said her emotions were good.  On March 22 2013, she said that emotionally she felt pretty good.  On April 11, 2013, she was observed to be pleasant and cooperative with good attention to her personal appearance.

There simply is no evidence of any mental impairment other than one allegation of feeling depressed and crying during a time when she had been accused of purposely misusing blood thinning medication in order to get admitted to the hospital to feed her opioid addiction. The substantial evidence in the record as a whole supports the ALJ's finding that plaintiff does not suffer from a severe mental impairment.

## VIII.  *RESIDUAL FUNCTIONAL CAPACITY BRIDGE*

Plaintiff next argues that the ALJ erred by failing to include a "narrative bridge" linking the medical evidence of record to the limitations set forth in the residual functional capacity assessment.  However, the ALJ is not required to provide each limitation in the residual functional capacity assessment immediately followed by a list of the specific evidence supporting this limitation.  See SSR 96-8p.  Such would not only be anathema to a finding based on "all of the relevant evidence," but would result in overly lengthy decisions containing

duplicative discussions of the same evidence in multiple sections. McKinney v. Apfel, 228 F.3d at 863. Such a requirement for duplicative and exacting discussion of every piece of evidence would only add further delay to the current backlog of cases awaiting decision by an ALJ, a backlog growing by the day. As the Supreme Court has stated, "[t]he disability programs administered under Titles II and XVI are of a size and extent difficult to comprehend," Heckler v. Day, 467 U.S. 104, 106 (1984) and "[t]he need for efficiency is self-evident." Barnhart v. Thomas, 540 U.S. 20, 28-29 (2003) (internal quotations omitted).

The fact that an ALJ did not describe the entirety of a claimant's medical history does not mean that he disregarded certain aspects of the record. Wheeler v. Apfel, 224 F.3d 891, 896, n. 3 (8th Cir. 2000). I have reviewed plaintiff's complaints and the record which is summarized above, and I find that the substantial evidence in the record as a whole supports the ALJ's residual functional capacity assessment.

IX. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
August 25, 2014